FIFTH URBAN, INC., APPELLANT, *v.* BD. OF BLDG. STANDARDS,
APPELLANT.
FIFTH URBAN, INC., APPELLANT, *v.* CITY OF CLEVELAND ET AL.,
APPELLEES.

[Cite as Fifth Urban, Inc., v. Board
(1974), 40 Ohio App. 2d 389.]

390

(No. 32953—Decided June 27, 1974.)

*Mr. Milt Schulman,* for appellant.
*Mr. Herbert R. Whiting,* law director, for appellees.

KRENZLER, P. J. Appellant Fifth Urban, Inc., is the owner of property located at 10301-23 Superior Avenue in the City of Cleveland. In 1910, a 3-1/2 story masonry type building, with stores and a theater on the ground floor and offices and dwelling units on the second and third floors, was constructed on the subject property. The building, called the Liberty Theater Building, was demolished by the City of Cleveland on the 1st day of October, 1973, as will hereinafter be discussed.

For convenience references to the following will be: Commissioner of Building and Housing, as Commissioner; Board of Building Standards and Appeals, as Board; Inspectors of the Department of Building and Housing, as Inspectors; Fifth Urban, Inc., the appellant property owner, as property owner or appellant; Division of Building and Housing of the City of Cleveland, as division; Liberty Theater Building, as building or premises.

An inspection was made by inspector Joseph Boland on May 18 and 19, 1970 and a violation notice was given to the property owner on June 1, 1970. An additional inspection was made on July 22, 1970 and the violation notice was reissued on July 27, 1970.[1]

The property owner was given until August 22, 1970 to correct the violations.

Again on July 29, 1970 a further inspection was made of the premises and it revealed that the condition of the building had gotten progressively worse.

In substance, the Inspector found that there were hazardous conditions, lack of maintenance, and the structure was vacant and open to the public; windows and doors were broken; hardware was missing; masonry was cracked; the marquee was decaying and a section was falling as it hung over public property; the fire escape was decaying; all of the dwelling units were vacant and vandalized; plumbing parts were missing and disconnected; plaster was falling and cracked; the roof was leaking; and the third floor offices were full of debris. The Inspector also found that the building was a health hazard and a public nuisance because it was open, vacant, vandalized, and the vandalism was getting progressively worse.

The property owner was directed to remove the debris and to abate the condition by demolition of the building, and was instructed to obtain the necessary permit to raze the building.

---

[1]The ordinances that were alleged as violated were: Cleveland, Ohio, Building Code ch. 7, sections 5.0705, 5.0708, ch. 1, section 5.0106, ch. 53, sections 5.5315, 5.5304, ch. 99, section 5.9902 (1951).

The property owner attempted to appeal this decision to the Board, and after much legal skirmishing the property owner did file an appeal from the Commissioner's decision on November 30, 1972 in which it contended: (1) that the order did not give the appellant an opportunity to correct the alleged conditions short of demolishing the building and that it should be given an opportunity to provide for the elimination of any of the alleged hazards without being required to demolish the building; (2) it had made every effort to keep the premises boarded and secured but that unknown persons had been systematically stripping the premises, and that the City of Cleveland had failed to provide the necessary police protection; (3) the building was structurally sound and was extremely valuable and it wished to preserve it in a way that would not be hazardous to anyone and would not affect the health, safety or welfare of any of the citizens of Cleveland.

The hearing was scheduled for February 26, 1973 and after a continuance the hearing went forward on March 5, 1973.

The first witness was Mr. Harry Fransen, Secretary of the Board, who reviewed all of the material contained in the docket, namely, the violation reports of June 1 and July 27, 1970. He also testified that the property was inspected by Inspectors Joseph Boland and Warren Thomas.

The record further reflects that on the morning of February 5, 1973 the entire Board made an exterior inspection of the property and that authorization was requested to view the interior of the premises but was denied by the property owner.

The attorney for the property owner admitted that the building was open, vacant and vandalized, but did not admit the alleged violations.

Inspector Joseph Boland was then called as a witness by the property owner and cross-examined. He testified that he examined the building as late as May 18 and 19, 1970 and July 22, 1970. He testified that the Building was never boarded up or secured. Counsel for the property owner then presented pictures of the property, which were

marked and admitted as appellant's exhibits 1-8. The photographs were reviewed by the Board.[2]

Counsel for the property owner then made a comment that he wanted to board the building up but he did not present any evidence that he made an application for a permit or introduce any evidence that after the building would be boarded up it would no longer be an "unsafe structure" or a nuisance. The Chairman stated that it would take counsel's request under advisement.

Mr. Boland testified that he saw people vandalizing the building and that debris and garbage were dumped on the property, that the building was a health hazard and that the building was never boarded up.

The appellant's next witness was Ken Asamoto, professional structural engineer, who was retained by appellant to make a physical examination of the subject property. He testified that he examined the building twice, approximately a year-and-a-half prior to his testifying, and a week before the hearing he examined the building from the exterior. He reviewed exhibits one through eight, and testified that there was no potential source of injury to anybody; that he did not see anything that would fall from the building or that was a potential danger to pedestrians walking on the sidewalk; that he examined the marquee of the theater and stated that it was in a safe condition; that it was structurally sound; that it was not necessary to take the marquee down to keep it safe, but it was only necessary to take the loose pieces off; that there was no danger to people walking by the building, and that if the building were secured and boarded there would be no danger to the people; that there was inorganic debris in the building; that he made a written report for this building approximately a year before he testified but he did not have a copy of the report with him; that there was a crack on the north wall of the building, but it was not a structural

[2]It is noted that at the conclusion of the hearing, counsel for the property owner took the photographs, Exhibits 1-8, with him and they are not a part of the record although they were viewed by the Board.

problem because it could be corrected by caulking; and further that he did not observe any leakage.

Upon examination by the Chairman of the Board, Mr. Asamoto testified that he made a visual inspection of the building from its exterior and that he also inspected the second floor and the marquee and that there were cracks in the masonry; and that he looked into the interior of the building from the first floor and went up to the second floor and saw penetrations to the floor.

On cross-examination by the City's attorney, Mr. Asamoto testified that he did not go into the basement to inspect the building, nor did he inspect the foundation. He admitted that he could not give a structural report without also seeing the foundation in the basement, which he did not inspect. In response to the question:

Q. I repeat, you cannot tell this Board that this building is structurally sound?

A. No. (R. 126)

On further cross-examination Mr. Asamoto testified that he was asked to visually inspect the building on the outside and never given the charge to actually see if the building should be razed or not.

The next witness was Ward 25 City Councilman Sidney Frost, who stated that violations of the building dated back to 1965, and that the vacant building was a safety hazard to the children in the neighborhood and that he saw rats in the building.

The next witness, Mrs. Audrey B. Jeters, testified that she saw tin fragments and pieces falling from the marquee of the building in August of 1972.

In its order dated March 5, 1973 the Board found: (1) that no effort was made by the property owner to take any corrective measures or obtain a building permit to abate the nuisance and that the owner failed to provide facts to refute the existence of the alleged building deficiencies or to suggest a program of corrective action; (2) each private property owner has an obligation to maintain its property and it cannot delegate this obligation to the city police for the security and maintenance of their buildings; (3) the

subject structure was seriously lacking in maintenance, and that it suffered from dilapidation, obsolescence and abandonment, and that the building was in a dangerous condition.

The Board affirmed the order of the Commissioner and the appellant was ordered to abate the hazards of the subject structure within 30 days by complete demolition and removal of debris.

On March 15, 1973, the property owner appealed the decision of the Board dated March 5, 1973 to the Court of Common Pleas of Cuyahoga County under R. C. 2506, and the Board submitted its transcript of proceedings to the Court on April 5, 1973 (Case Number 915,484).

In addition, the property owner filed an independent declaratory judgment action in the Court of Common Pleas (Case No. 917,628). Plaintiff alleged that the City of Cleveland intended to demolish the building which would make Case Number 915,484 moot; that the building was not a nuisance and in no way menaced or endangered the health and safety of any citizen of Cleveland and prayed for an injunction restraining the defendants from any act that might result in damage or demolition of the property.

The defendant, City of Cleveland, filed an answer and cross complaint, and in the answer the City admitted that the building had been placed on a list of buildings for which a contract for demolition was about to be let.

In its cross complaint the City of Cleveland alleged that the building owned by the plaintiff was a public nuisance, a hazard to the health, safety and welfare of the citizens of Cleveland, and in violation of the codified ordinances of the City of Cleveland. The City then prayed for an order requiring the plaintiff to demolish the building or to bring its real property in compliance with the codified ordinances of the City of Cleveland. The trial court granted preliminary injunctions in both cases until final disposition, and the City was enjoined from demolishing or causing to demolish the so-called Liberty Theater and from any way enforcing the Board's decision of March 5, 1973, which is the subject of the litigation.

The appeal and the declaratory judgment action were consolidated and the cases tried on the record made before the Board. No additional testimony was taken.

On July 30, 1973 the trial court affirmed the Board's action, and on August 1, 1973 the property owner filed a motion for a stay of execution and on August 6, 1973 filed a notice of appeal from the trial court's judgment. On August 9, 1973 the trial court granted appellant's motion for a stay of execution upon condition that the plaintiff post a supersedeas bond in the amount of $25,000.

Appellant then filed a motion in the Court of Appeals to modify the Common Pleas Court order of August 9, 1973 setting a bond of $25,000, and for a stay of execution.

On September 12, 1973 the Court of Appeals set a hearing on the motion to modify for September 18, 1973, and also ordered that pending the disposition of this motion, the judgment of the Board and the judgment of the Court of Common Pleas be stayed.

A hearing on the motion to modify the $25,000 bond was held on September 18, 1973. All parties were present in court.

On the 1st day of October, 1973, and before this Court ruled on the motion to modify, the Liberty Theater Building was demolished by the City. On October 3, 1973 appellant filed a motion to cite the City for contempt of court for violating this Court's stay order of September 12, 1973.

We, therefore, have three issues to resolve in this case:

1. Was the trial court correct in affirming the decision of the Board which had upheld the Commissioner's order finding the appellant in violation of various City ordinances?

2. Was the trial court's order setting a supersedeas bond proper?

3. Was the City of Cleveland in contempt of this Court's order of September 12, 1973 which stayed further proceedings?

### I.

The first issue we will decide is whether the trial court was correct in affirming the Board's decision.

The authority of a municipal corporation to enact ordinances requiring demolition or repair of "unsafe structures" is within the so-called "police powers." This has has been defined as that inherent sovereignty, which is the right and duty of government to exercise whenever public policy demands for the benefit of society at large. In furtherance of this power regulations may be passed to secure the morals, safety, health and order of the governed. The police powers are based on the proposition that the rights of the individual are subject to certain limitations and subordinate to the welfare of society as a whole, and that society acting through its representatives may curtail individual rights where such curtailment is necessary in the interest of the public welfare. See *Miami County* v. *Dayton* (1915), 92 Ohio St. 215; *Board of Health* v. *Greenville* (1912), 86 Ohio St. 1.

The Supreme Court of Ohio in *Lindsay* v. *Cincinnati* (1961), 172 Ohio St. 137 stated that the police power includes everything essential to public health, safety and morals and it may be used to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance.

There are, however, constitutional limitations imposed upon the exercise of the police power. *Board of Health* v. *Greenville, supra*. To be a valid police regulation it must have a clear and substantial relation to a proper object of the police power, and must not be arbitrary, discriminatory, capricious or unreasonable and must bear real and substantial relation to the subject sought to be obtained, namely, the health, safety, morals, or general welfare of the public. *Cincinnati* v. *Correll* (1943), 141 Ohio St. 535; *State, ex rel. Clarke,* v. *Deckebach* (1925), 113 Ohio St. 347.

It is also noted that the police powers cannot be exercised for aesthetic reasons, but if the purpose is the preservation of property values, such regulation is valid because economic considerations are proper purposes of police regulations. See *Pritz* v. *Messer* (1925), 112 Ohio St. 628; *Holsman* v. *Thomas* (1925), 112 Ohio St. 397.

It is well recognized that almost every exercise of the

police power will necessarily interfere with the enjoyment of liberty or the acquisition, possession and production of property within the meaning of Article I, Section 1 of the Ohio Constitution, or involve an injury to a person within the meaning of Article I, Section 16 of the Ohio Constitution, or deprive a person of property within the meaning of Amendment XIV, Section 1 of the United States Constitution, but an exercise of this power will be valid if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and it is not unreasonable or arbitrary.

Building regulations are one of the oldest forms of the exercise of the police power of municipalities, and a municipality may pass any ordinance reasonably necessary for the safety of the public with respect to the construction of buildings. See *City of Xenia* v. *Schmidt* (1920), 101 Ohio St. 437.

A taking of property by ordering it demolished under the police power is not a taking of property without compensation. See *Kroplin* v. *Truax* (1929), 119 Ohio St. 610; *Pritz* v. *Messer, supra*. Further, the state and federal constitutional guarantees do not take away the common law right of the government to abate nuisances. *State* v. *French* (1905), 71 Ohio St. 186.

Where a building fails to comply with the building code requirements and is in a dangerous and unsafe condition, it can be razed by municipal officials when properly authorized by ordinance. However, where the building can be repaired and the danger to the public is not so imminent that it requires immediate razing of the building, the owner must be given a reasonable time in which to repair the building, if he so desires. See *Abraham* v. *City of Warren* (1940), 67 Ohio App. 492; *Maxedon* v. *Rendigs, Bldg. Commr.* (1917), 9 Ohio App. 60.

In order to resolve the issue of whether the appellant's building was an "unsafe structure," we must review the applicable law. The City of Cleveland adopted its building code which is entitled Part 5 of the Codified Ordinances.

The building code is administered by the Commissioner

of Building and Housing.[3] Pertinent provisions of the Building Code state that all buildings and structures existing and new must be maintained in a safe and sanitary condition, and before a structure can be occupied it is inspected to see if it complies with the building code and other ordinances and if it does, a certificate of occupancy is issued.[5]

The building code of the City of Cleveland requires further periodic inspections of property to make sure that the property remains in compliance with the building code and all of the terms of the certificate of occupancy.[6] If a building does not comply with the building code, the certificate of occupancy may be revoked. Whenever any building or other structure is used or occupied so as to be in violation of, or not in conformity with, any provision of the building code, the Commissioner through the Director of Law may institute an appropriate action at law or in equity to prevent the occupation or use of such building.[7] When any City employee empowered to inspect buildings becomes aware of any violation of the building code he must promptly report it to the administrative officer having jurisdiction and the administrative officer must act promptly and without unnecessary delay.[8]

It is noted that any officer or employee charged with the enforcement of the building code acting for the City in good faith and without malice is not personally liable for any damage that may accrue to persons or property as a result of any act or omission in the performance of his official duties and any suit brought against such person shall be defended by the Department of Law.[9]

As to serious violations of the building code, buildings may be classified by the Commissioner as ''unsafe struc-

[3]Cleveland, Ohio, Building Code ch. 7, section 5.0701 (1951)

[4]Cleveland, Ohio, Building Code ch. 1, section 5.0106(a) (1951)

[5]Cleveland, Ohio, Building Code ch. 5, section 5.0501 (1951)

[6]Cleveland, Ohio, Building Code ch. 7, section 5.0705(a) 2 (1951)

[7]Cleveland, Ohio, Building Code ch. 7, section 5.0709 (1951)

[8]Cleveland, Ohio, Building Code ch. 7, section 5.0701(e) 1 and 2 (1951)

[9]Cleveland, Ohio, Building Code ch. 7, section 5.0703 (1951)

tures.'' An ''unsafe structure'' is one that is structurally unsafe, unsanitary, or not provided with adequate safe egress or if it constitutes a fire hazard or is otherwise dangerous to human life, or if in relation to existing use it constitutes a hazard to safety or health by reason of inadequate maintenance, dilapidation, obsolescence or abandonment. All such ''unsafe structures'' are illegal and shall be abated by repair and rehabilitation or by demolition.[10]

The procedure for declaring a building an ''unsafe structure'' is outlined in the city ordinances. The Commissioner is to have every such reported structure examined and when he finds it to be an ''unsafe structure'' he shall give notice to the owner with an order that he shall either complete the specified repairs or improvements or demolish and remove the building or structure.[11]

If necessary the Commissioner can also order that the building be vacated until the improvements are completed.[12] In cases of emergency, which in the opinion of the Commissioner involve immediate danger to human life or health, he shall promptly cause such building or structure to be made safe or removed.[13]

The owner has a right to appeal from the decision of the Commissioner and appear before the Board to show cause why he should not comply with the notice.[14]

The appeal shall be made within thirty days after a decision is made but in the case of a dangerous or ''unsafe structure'' the appeal period may be shortened.[15]

Such appeal shall stay all proceedings in furtherance of the action appealed from unless the Commissioner files with the Board a certificate stating that a stay would in his opinion cause immediate peril to life or property, in

---

[10]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a)

[11]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a) 1 and 2 (1951)

[12]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a) 3 (1951)

[13]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a) 6 (1951)

[14]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a) 4 (1951)

[15]Cleveland, Ohio, Building Code ch. 7, section 5.0717(e) 2 (1951)

which case the proceedings shall not be stayed, except by a restraining order which may be granted by the Board or by a court of competent jurisdiction upon application and upon notice to the Commissioner.[16]

The Board shall fix a reasonable time for the hearing of the appeal and shall make its decision without unreasonable or unnecessary delay.[17]

It is again noted that in the case of an ''unsafe structure,'' after the Commissioner's decision and before an appeal is taken the Commissioner may require that the building be vacated and not occupied or used until the specified repairs and improvements are completed. Also, in cases of emergency the Commissioner can summarily cause the building to be made safe or removed. After an appeal is taken the Board has jurisdiction, but the Commissioner may limit or shorten the period of appeal and also may attempt to overcome the automatic stay in the proceedings by filing a certificate reciting facts that would show a stay would cause immediate peril to life or property. If the certificate is filed, the proceedings may only be stayed by a restraining order granted by the Board or by a court of competent jurisdiction.

A person aggrieved by a decision of the Board may appeal that decision to the appropriate court within fifteen days after the posting or publication of the decision.[18]

In the present case the Commissioner issued his order and there was an appeal to the Board. However, the Commissioner did not declare an emergency under Ordinance 5.0708(a) 6 nor did he file the certificate under Ordinance 5.0717(e) 3, stating that there was an immediate peril to life or property.

In this case the appellant has the burden of proving that it was not in violation of the ordinances as charged.[19]

We have carefully reviewed the record and conclude

---

[16]Cleveland, Ohio, Building Code ch 7, section 5.0717(e) 3 (1951)

[17]Cleveland, Ohio, Building Code ch. 7, section 5.0717(e) 4 and (g) 1 (1951)

[18]Cleveland, Ohio, Building Code ch. 7, section 5.0717(g) 3 (1951)

[19]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a) 4 (1951)

that the trial court was correct in affirming the Board's order of March 5, 1973, which found the appellant's building to be an "unsafe structure."

However, the Board's order was not in compliance with Ordinance 5.0708. The Board's order was to abate the hazard within 30 days by complete demolition and removal of debris. Ordinance 5.0708 provides that "unsafe structures" shall be abated by repair and rehabilitation, or by demolition. The Board's order and the demolition of the building deprived the appellant of the opportunity to repair and rehabilitate the property. *Maxedon* v. *Rendigs, Bldg. Commr., supra.*

We note that any consequences which will flow from the action of the City of Cleveland in prematurely demolishing this building and depriving the owner of its opportunity to repair or rehabilitate the building in compliance with Ordinance 5.0708 will have to be resolved between the parties in subsequent proceedings other than this appeal. See *Abraham* v. *City of Warren, supra.* We are only concerned with the validity of the Board's order finding the appellant in violation of the various Cleveland City ordinances.

Appellant has also raised the issue of its being denied an opportunity to board up its building.

In this case the appellant did not make an application for a permit to board up the building nor does the record demonstrate that the building would not be an "unsafe structure" or a nuisance if it were boarded up.

The City of Cleveland may require that an "unsafe structure" be repaired or demolished so that it will no longer be an "unsafe structure."[20] In addition, if upon inspection it is determined by the Commissioner that a building no longer complies with the building code and the conditions of its occupancy permit, the occupancy permit may be revoked and the building vacated.[21] This then places the owner in a dilemma of whether to repair the building or

---

[20]Cleveland, Ohio, Building Code ch. 7, section 5.0708(a)

[21]Cleveland, Ohio, Building Code ch. 5, section 5.0501, ch. 7, section 5.0705(a), section 5.0707, section 5.0709

leave it vacant and unoccupied. If he repairs the building and then complies with the building code, it can then be occupied and an occupancy permit will be issued. If the owner does not make the repairs the building cannot be occupied and it will remain vacant. In this condition the building will then become a target for vandals and ultimately become an "unsafe structure" and then the building will either have to be repaired or demolished under Ordinance 5.0708. Sound business practices would dictate that the owner of the building would repair it immediately upon being notified that the building does not comply with the building code and the owner will lose his occupancy permit. However, in changing urban areas many times buildings no longer have economic vitality or viability, and the owner may decide that the costs of repairs exceed the economic value to him, and he will choose to leave the building vacant until such times as conditions change.

As a result, urban centers are becoming vast wastelands. Unfortunately, the remaining property owners who want to maintain their property are at a disadvantage and they become an island of despair surrounded by a sea of disrepair. One nuisance attracts another. When one building becomes vacant and vandalized, it is contagious and before long the entire neighborhood suffers the same fate.

The present statutory scheme authorizes the demolition or repair of an "unsafe structure" and also permits the Commissioner to revoke the occupancy permit of a building that does not comply with the building code. However, it does not specifically deal with what to do with a building that does not meet the building code requirements and yet is not an "unsafe structure," or a nuisance. In other words, the building code does not provide for the mandatory repair of a structure not in conformance with the code.

A question is thus raised as to whether the owner of a building may board up his building when it does not comply with the building code, where the building is not, in fact, an "unsafe structure" or a nuisance. There are those that argue that boarding up any building renders it a nuisance

and as a matter of law a building should either comply with the building code or be demolished. Property owners argue that it is possible to board up a building and at the same time not render it a nuisance or an "unsafe structure."

Under the present statutory scheme an owner of a building that is not classified as an "unsafe structure" or a nuisance but yet does not satisfy the standards of the building code has the option of:

(1) Repairing the building to bring it up to code and retain his occupancy permit;

(2) Leaving the building vacant and unoccupied and gamble that the building will stay in this condition until the owner is ready to repair it and the building will not become vandalized;

(3) Seek a permit to board the building up; or

(4) Demolish the building.

It does not make sense for an owner of a building that does not comply with the building code, but which is not yet an "unsafe structure" to leave the building in a vacant condition without repairing it because it will ultimately become an "unsafe structure" and have to be repaired or demolished. Repairs at that time would cost substantially more than repairs immediately upon being notified that the building does not comply with the building code; but as previously stated, economic realities make conditions such that the owner may not deem it feasible to put money into the repair of his structure at the present time in order to bring it up to code. He merely wants to board the building up until economic conditions change for the better. He argues that leaving the building unboarded and unoccupied will only result in the further deterioration of the building and it will then be vandalized and ultimately become a nuisance. He contends that by boarding up the building it will not become a nuisance and that this is better than leaving it vacant and unboarded.

There is no specific authority contained in the ordinances of the City of Cleveland for a building to be boarded up. However, if a building can remain vacant and unoccupied it would be much better to have the building boarded up to prevent vandalism than to allow the vacant building

to be vandalized and ultimately become an "unsafe structure."

A building permit may be issued by the Commissioner where an application is made to board up a building. Whether such a permit should be issued is a matter within the discretion of the Commissioner, and as long as the building will not be rendered an "unsafe structure" or a nuisance, it may be boarded up. If, upon request, a permit is refused, the property owner may take an appeal to the Board where he will have the burden of showing that by boarding up the building it will not be a health or safety hazard, and consequently not a nuisance or an "unsafe structure." If the appellant meets his burden, the Board may order the permit issued.

Upon reviewing the entire record including the transcript of testimony, we conclude that the appellant did not meet its burden of proof that the Liberty Theater Building was not an "unsafe structure." The record supports the Board's finding that the building was an "unsafe structure" and pursuant to the provisions of Ordinance 5.0708, the appellant should have abated this illegal building by repair and rehabilitation or by demolition.

## II.

The trial court was not correct in setting a supersedeas bond of $25,000. The aforementioned ordinances provide that unless the emergency provisions are involved for summary demolition of a building, a stay order shall be issued. Further, there is no provision for a supersedeas bond, nor does the record warrant a bond of $25,000. However, the demolition of the building by the City makes this issue moot; therefore, appellant's motion to modify is overruled.

## III.

We find that when the City of Cleveland demolished the Liberty Theater Building on October 1, 1973, it was in violation of this Court's stay order entered on September 12, 1973 and therefore is in contempt of court and is hereby fined $250.[22]

---

[22]By agreement of the parties there was no oral hearing on this issue and it was submitted on briefs.

406

In conclusion, we affirm the trial court's decision affirming the Board's order that the Liberty Theater Building was an "unsafe structure" under Ordinance 5.0708.

*Judgment affirmed.*

JACKSON and DAY, JJ., concur.